- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONTA JENKINS,

                     Plaintiff,

       v.

DANIEL FRISCH, DANIEL HUNEKE and
DANIEL NORGE,

                    Defendants.

OPINION AND ORDER

16-cv-684-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Donta Jenkins is proceeding on claims that three psychologists at Columbia Correctional Institution failed to provide him adequate mental health treatment, in violation of the Eighth Amendment and state negligence law. Before the court is a motion for summary judgment filed by defendants Daniel Frisch, Daniel Huenke and Daniel Norge. Dkt. #36. (I have amended the caption of the complaint to reflect defendants' full names and the correct spelling of their names). For the reasons explained below, I am granting defendants' motion for summary judgment.

Turning to the parties' proposed findings of fact, I note that in many cases, plaintiff has cited a large group of medical records in support of a general or conclusory statement that he makes in his proposed findings of fact or in his responses to defendants' proposed findings of fact and instructs the court to read the entire document. This practice violates the court's summary judgment procedures, which tells parties that "[e]ach factual proposition must be followed by a reference to evidence supporting the proposed fact. The citation must make it clear where in the record the evidence is located." Pretr. Conf. Ord.,

dkt. #18, at 17. In addition, the procedures warn the litigant that "[t]he court will not search the record for factual evidence. Even if there is evidence in the record to support your position on summary judgment, if you do not propose a finding of fact with the proper citation, the court will not consider that evidence when deciding the motion." Id. at 14. Therefore, I have considered plaintiff's proposed findings of fact and responses to defendants' proposed findings of fact only to the extent that they are clearly and obviously supported by his citations to the medical record.

From the parties' proposed findings of fact, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

A. The Parties

From November 12, 2015 to May 16, 2017, plaintiff Donta Jenkins was incarcerated at the Columbia Correctional Institution, where all of defendants worked. Plaintiff was released from custody to extended supervision on May 16, 2017.

Defendants Daniel Frisch, Ph.D. and Daniel Norge, Psy.D. are psychological associates who are responsible for conducting mental health screenings, brief individual counseling and mental health monitoring; providing crisis intervention and prevention, individual psychotherapy and group psychotherapy; attending multidisciplinary team meetings; and developing psychological assessments to provide mental health services. Unlicensed psychology associates like Frisch (defendants do not say whether Norge was

licensed) may assume a caseload and provide direct patient care, provided the work they perform is reviewed and approved by a supervising psychologist.

Frisch was plaintiff's primary clinician and always worked under the supervision of the psychological service unit supervisor, who is a licensed psychologist. Norge saw plaintiff in response to a request or on weekly rounds if Frisch was unavailable or away. (Plaintiff says that Norge was his primary clinician while he was housed on unit 8 and Norge says that he was not, but this dispute does not matter for purposes of summary judgment.)

Defendant Daniel Huneke was the interim psychological service unit supervisor from January to September 2016. In that role, he reported to the deputy warden, was responsible for the overall administration and coordination of the psychological service unit, provided psychological services to offenders, made recommendations for institutional programming, assisted in providing training to staff and participated in structured case conferences and staffing. Huneke reviewed and, if appropriate, approved Frisch's reports and documentation relating to plaintiff's care and met weekly with Frisch to review his progress with and care of the various patients assigned to him. However, Huneke did not provide any direct patient care to plaintiff.

Although defendants consulted with plaintiff's psychiatrists about treatment, defendants are psychologists who do not have the authority to prescribe medications to inmates. Moreover, defendants do not deliver or administer medications to inmates. If an inmate requests medications or it is believed that medications may be beneficial to an inmate, he may be referred to a psychiatrist.

### B. Plaintiff's Previous Mental Health Classifications

From 2007 to 2015, plaintiff was classified as mental health code MH-0, meaning that he had no mental health needs, or MH-1, meaning that he had some mental health needs but was not seriously mentally ill. When plaintiff was housed at the Stanley Correctional Institution in early 2015, he began reporting delusional thinking and was changed to code MH-2A, meaning that he had one or more disorders that rose to level of serious mental illness. The clinicians at Stanley suspected that plaintiff had a delusional disorder, but one month later, they changed his code back to MH-1 because they believed that plaintiff's symptoms had abated.

On April 30, 2015, plaintiff was sent to the Wisconsin Resource Center, where he remained for approximately six months. In September 2015, plaintiff's mental health code was changed to MH-2A. Although clinicians at the Wisconsin Resource Center noted that they believed that plaintiff suffered from delusions, they thought that he was exaggerating his symptoms to prolong his stay at the Wisconsin Resource Center.

### C. Initial Intake and Assessment at Columbia

After plaintiff was transferred to the Columbia Correctional Institution on November 12, 2015, he was placed in the reception and orientation unit. That day, defendant Frisch saw plaintiff for a clinical welfare check and reviewed plaintiff's history. Plaintiff told Frisch that he did not want to take medication but hoped to continue with the positive psychology exercises he had been doing at his previous institution. Frisch told plaintiff that he would

provide him information packets and positive psychology exercises. (Plaintiff says that Frisch never gave him the information packets as promised. Defendants say that plaintiff was given therapy worksheets.) In a form signed on November 19, 2015, Frisch noted that plaintiff had stated during the November 12 intake that he did not want a cell mate and would refuse a double bunk; had no evidence of thought disorder; denied suicidal, homicidal or self-injurious ideation, plan or intent; and his diagnosis was delusional disorder but he appeared to exaggerate his symptoms in an effort to remain at the Wisconsin Resource Center.

On November 17, 2015, plaintiff made a noose (which he did not place around his neck) and threatened to kill himself if he was returned to his cell. Captain Pitzen called Frisch, who was the on-call clinician at the time, and relayed the details of the incident. Frisch decided to place plaintiff on observation status for his own safety and not as a punitive measure. The next day, plaintiff reported to Frisch that he wanted to be removed from observation and that he was no longer experiencing thoughts of suicide or self-harm. Relying on plaintiff's report, Frisch's clinical observation while meeting with plaintiff and a review of the observation logs completed by security staff, Frisch decided to remove plaintiff from observation status.

On November 19, 2015, Frisch saw plaintiff at his cell for followup on his release from observation status and plaintiff reported that he no longer had any current thoughts or plans for suicide but wondered where he would be placed when released from the restrictive housing unit. Frisch told plaintiff that he would be returned to the reception and

orientation unit and may be housed with another inmate. Plaintiff said that he wanted to be transferred to the Wisconsin Secure Program Facility. After Frisch told plaintiff that he would not be transferred because of his mental health code, plaintiff asked how he could get his MH-2A code to MH-1 in order to begin the process for transfer. Frisch agreed to meet with plaintiff to discuss the matter further but told plaintiff that reducing his mental health code would not automatically clear him for return to Wisconsin Secure Program Facility. Although plaintiff was frustrated, he said he understood.

Relying on his assessment on November 19, 2015, Frisch maintained plaintiff's current diagnosis of delusional disorder–precursory type, continuous, but noted that the diagnosis remained under review. Frisch noted that in light of plaintiff's presentation and a review of the available records, he had concerns about whether the diagnosis of delusional disorder was appropriate because plaintiff had not verbalized any delusional or persecutory thoughts or manifested any behaviors that might suggest them. (Plaintiff points to records saying he had verbalized a belief that a cell mate was mistreating him but the records do not refute Frisch's observations because they describe incidents that occurred either before plaintiff was transferred to Columbia or well after Frisch's assessment on November 19, 2015.)

Frisch made a plan to see plaintiff for clinical monitoring pursuant to Department of Corrections Policy 500.70.16, which requires psychological clinicians to meet with inmates at regular intervals if the inmates are not receiving regular treatment or requesting psychological services. Under the general standard, inmates on clinical monitoring are seen

6

a minimum of every three to six months, depending on their mental health code. Because plaintiff was coded as MH-2A when he transferred into the prison, he required mental health followup at a minimum of every three months.

Frisch also planned to administer plaintiff the Miller Forensic Assessment of Symptoms Test (MFAST), a brief psychological assessment used to screen for suspected malingering. Elevated scores on the test suggest malingering but a clinical interview, record review and other detailed assessment measures are required to diagnose malingering. Frisch never conducted the MFAST but at a later date, he administered the Minnesota Multiphasic Personality Inventory – 2 (MMPI-2) because he determined that it would provide more clinically relevant and diagnostic information. (These test results are discussed further below.) Frisch continued to follow up with plaintiff as needed to assess plaintiff's mental health status.

After the intake meeting with plaintiff, Frisch met with his supervisor, who at that time was Dr. Wood, and discussed his beliefs that plaintiff was taking actions (such as threatening suicide) in an attempt to get a single cell and a transfer to the Wisconsin Secure Program Facility. Wood reviewed and signed off on Frisch's clinical contacts with plaintiff. Frisch made a treatment plan to monitor plaintiff's clinical needs and provide plaintiff cognitive behavioral therapy.

D. Defendant Frisch's Ongoing Monitoring of Plaintiff

During a clinical contact with plaintiff on December 14, 2015, Frisch noted that since arriving at Columbia, plaintiff had not verbalized any delusional or persecutory thoughts or manifested any behaviors that might suggest such thoughts. He also noted that plaintiff exhibited a pattern of behavior that was atypical of and not consistent with delusional disorder, including:

- Before early 2015, plaintiff had not made any delusional statements to psychological unit staff that were documented in his records.

- Although Stanley Correctional Institution psychological unit staff suspected plaintiff had a delusional disorder in early 2015 and changed his code to MH-2A, they noted that his symptoms had abated one month later and returned his code to MH-1.

- Plaintiff was coded MH-1 when he transferred to the Wisconsin Resource Center on April 30, 2015, but his code again changed to MH-2A in September 2015.

(In response, plaintiff says that he made multiple reports to staff about his cell mate mistreating him and tampering with his property, but he does not say when he made those reports or whether they qualified as delusions, and he does not refute Frisch's statement that his delusional symptoms fluctuated rapidly.) In addition, Frisch found it significant that clinicians at the Wisconsin Resource Center noted that even though they believed that plaintiff suffered from delusions, they thought he was exaggerating his symptoms in order to stay at the center. Frisch further noted that plaintiff had displayed behaviors at Columbia—including threats of suicide—in an apparent attempt to manipulate his housing. Therefore, Frisch chose to maintain plaintiff's MH-2A mental health code but changed plaintiff's diagnosis to "delusional disorder, persecutory, and continuous vs. malingering

(rule out)" to address his suspicions that plaintiff was exaggerating his symptoms. Frisch made a plan to continue to see plaintiff for clinical monitoring in accordance with the department policy and at plaintiff's request, as well as to see plaintiff weekly while he was in the restrictive housing unit.

On December 22, 2015, Frisch attempted to meet with plaintiff to address various issues (the parties do not identify the issues) that plaintiff had raised in psychological request forms. (Defendants present prison records from correctional staff that say that plaintiff refused to meet with Frisch. Plaintiff says that prison staff "fraudulently logged" his refusal to see Frisch, but he does not say what happened or why he believes this.) Frisch continued to follow up with plaintiff on a regular basis to assess his mental health status and address concerns he raised in psychological service requests. As outlined in more detail below, Frisch saw plaintiff on January 5, 12, 19 and 25, 2016, February 2, 2016, April 28, 2016, May 16 and 24, 2016 and June 2 and 8, 2016. During each appointment, plaintiff denied any suicidal, homicidal or self-injurious ideation, plan or intent, Frisch spoke with plaintiff at length about his concerns and Frisch made a plan to continue with the current treatment plan in place. Throughout this period, Frisch maintained plaintiff's current diagnosis as "delusional disorder, persecutory, continuous vs. malingering (rule out)" and his mental health code of MH-2A. Although Frisch suspected that plaintiff was malingering and had gathered data in his clinical interviews with plaintiff and by observing plaintiff's behavior, Frisch did not have the information he needed to confirm a diagnosis of malingering.

On January 12, 2016, plaintiff told Frisch that he had no desire to take medication. (In response to this fact, plaintiff submitted a copy of a letter he sent to Frisch, stating that he was open to taking medications, but the letter is not dated and plaintiff does not say when he sent it.) During plaintiff's January 19, 2016 appointment, he told Frisch that after he was assigned a cellmate, he held the trap of his cell door closed and refused to return his meal tray in an attempt to be moved out of a double cell. Frisch told plaintiff that the Wisconsin Resource Center had denied plaintiff's written request for a transfer and that the treatment team at that institution had declined to accept a referral for plaintiff at that time. In response, plaintiff asked for his code to be dropped to MH-0 so that he could return to the Wisconsin Secure Program Facility. Frisch told him a transfer was not possible in light of his diagnosis and symptoms.

Also on January 19, 2016, plaintiff volunteered to see a psychiatrist. Frisch contacted the health services unit and an appointment was scheduled for the next day with Dr. Maier, one of Columbia's psychiatrists. Frisch also developed a behavior management plan in which plaintiff agreed to accept necessary cell moves without complaint, comply with staff directives and continue to meet with psychological staff on a weekly basis.

At the April 28, 2016 appointment, Frisch noted that plaintiff seemed to be acting out on the housing units in an attempt to be moved to a single cell. Frisch had contacted Wisconsin Resource Center staff before meeting with plaintiff to inquire about the pre-release program because plaintiff did not have much time left to serve and had asked previously about being transferred to the center to participate in their pre-release

programming. However, the center staff concluded that there did not appear to be any benefit from participating in that program that could not be acquired by plaintiff's participation with the social worker at Columbia.

Plaintiff refused to meet with Frisch on two occasions in May 2016. (The parties dispute the reason for this. Plaintiff says it was because he was on a hunger strike and that Frisch never came to assess him. However, defendants point to progress notes showing that Frisch attempted to assess plaintiff's hunger strike but plaintiff refused.) After an appointment with plaintiff on June 8, 2016, Frisch met with his supervisor, Dr. Huneke, and the two decided to conduct an evaluation of plaintiff to assist in diagnostic clarification and treatment planning.

On June 16, 2016, Frisch began administering plaintiff the MMPI-2, a psychological test used to measure various personality traits. The measure also contains numerous validity scales that provide valuable information about an individual's truthfulness in answering the questions, over or underreporting of symptoms, exaggeration of symptoms and defensiveness. The test consists of 567 true or false questions. The examinee is given a booklet containing the questions and an answer sheet to fill in the bubble next to true or false for each question. The results of plaintiff's test revealed a pattern of intentional over-reporting and elevations consistent with the exaggerating of psychopathology. On the basis of the objective data gathered by the MMPI-2 and his subjective diagnostic impressions noted throughout his clinical contact notes, Frisch reached the clinical opinion that plaintiff

was malingering. As a result, Frisch changed plaintiff's mental health code to MH-1 so as to reflect his mental health concerns more accurately.

On July 1, 2016, Frisch met with plaintiff to provide feedback on the MMPI-2 results and discuss therapeutic goals. Although plaintiff insisted that he had answered the test questions honestly, Frisch believed that plaintiff's words did not match his actions. Plaintiff made multiple references about wanting to "get stable" before being released, but he was unable to provide any specific examples of areas in which he was not stable. Relying on the test results and his observations and impressions, Frisch changed plaintiff's diagnosis to malingering psychotic symptoms. Frisch further made a plan to follow up with plaintiff for clinical monitoring and to meet with him by referral or request. Frisch encouraged plaintiff to follow up with a psychological services request if he was able to identify any specific mental health areas and concerns he would like to address prior to his release. (Plaintiff says that Frisch failed to provide him forms to use for applying for Supplemental Social Security Income benefits, but otherwise he has presented no evidence to dispute Frisch's account.) Frisch tried to meet with plaintiff for continued clinical contacts on July 12, August 29 and September 15, 2016, but plaintiff refused to see him.

At plaintiff's request, Frisch next met with plaintiff on October 11, 2016. Frisch noted no overt evidence of a thought disorder based on plaintiff's statements and observed no attendance to internal stimuli. Plaintiff also denied current suicidal, homicidal or self-injurious ideation, plan or intent. Frisch diagnosed malingering psychotic symptoms and anti-social personality disorder and maintained plaintiff's MH-1 code. He noted that

plaintiff continued to refuse to accept responsibility for his own actions and added that, until plaintiff was able to accept responsibility for his incarceration and behavior, he would not be able to truly benefit from therapy. Frisch made a plan to continue to see plaintiff for clinical monitoring.

Also on October 11, 2016, plaintiff met with Dr. Joel Rigueur, a psychiatrist at Columbia, who diagnosed major depressive disorder with psychotic features and a non-specified personality disorder. He noted that plaintiff's reports seemed "reliable."

On October 18, 2016, Frisch noted that plaintiff showed some progress and hoped that he would continue to have an open mind and positive attitude toward helping in his own recovery. Nonetheless, Frisch continued to have concerns about plaintiff's willingness to accept responsibility for his own actions. He kept plaintiff's current diagnosis and MH-1 mental health code. After this appointment, plaintiff was assigned to the caseload of another clinician at Columbia, and Frisch no longer provided him treatment.

Overall, Frisch's perceptions of plaintiff were that he had a tendency to focus on discussing his complaints about staff, his housing situation and overall treatment and care at Columbia. According to Frisch, during one-on-one contacts, plaintiff expressed and demonstrated minimal motivation or interest in participating in the development of coping skills and other ways to help manage his reported symptoms. Frisch also wrote that plaintiff often focused on blaming others for his behaviors and was unwilling to take responsibility for the consequences of his own actions. Plaintiff consistently engaged in behaviors of

threatening self-harm or harm to others, usually his cellmate, and it was Frisch's opinion that plaintiff made such threats to manipulate staff in an effort to be single celled. (In response, plaintiff says that Frisch was always suspicious of his motives even though plaintiff consistently struggled and had a hard time coping with repeated long period stays in solitary confinement without proper mental health care. However, plaintiff does not identify any specific mental health care that he should have been offered or that he had asked for and was not provided.)

### E. Plaintiff's Appointments with Defendant Norge

Defendant Norge met with plaintiff on November 13, 2015, after plaintiff submitted a psychological services request in which he expressed thoughts of injuring himself. Plaintiff told Norge that he had submitted the request before he was seen by Dr. Frisch on November 12, 2015 and denied any current ideation, plan or intent to hurt himself. Norge reviewed plaintiff's clinical record and found that plaintiff had a diagnosis of delusional disorder, persecutory type–continuous, that he was currently assigned a mental health code of MH-2A and that he had a history of being placed in clinical observation status when he had a cellmate. Plaintiff did not want any medications except Benadryl to help him sleep, but Norge told plaintiff how to submit a request to see a psychiatrist if he wanted other medication.

On March 31, 2016, Norge met with plaintiff after plaintiff had asked to be seen by psychological staff. Plaintiff told Norge that he wanted his mental health code decreased

because he was concerned that he would be forced into treatment on his release from prison. He discussed his feelings of anger and his belief that he was being persecuted and harassed by staff, other inmates and his family, but he did not report suicidal ideation, intent or plan or any symptoms of psychosis. Relying on his assessment of plaintff, Norge believed his diagnosis of delusional disorder, persecutory type, continuous vs. malingering (rule out) and mental health code as MH-2A were appropriate. Despite plaintiff's request, Norge did not change plaintiff's mental health code and made a treatment plan for followup clinical monitoring by referral or request.

Although Norge attempted to meet with plaintiff on April 10, 2017, plaintiff refused, to do so, stating that he wanted to sleep rather than receive mental health treatment. (Although plaintiff tries to refute this fact by pointing to psychological service request forms in which he asked for treatment and complained about not being seen, his attempt fails because the forms are dated after Norge's April 10 visit and are therefore not relevant. Norge stopped at plaintiff's cell door on April 12 and plaintiff asked to be seen out of his cell. Norge noted that plaintiff did not "present with immediate mental health concerns" and told plaintiff that he would schedule an appointment for him with a clinician. Norge did not change plaintiff's diagnosis or mental health code at that visit.

F. Defendant Huneke

Although defendant Huneke did not provide any direct care or services to plaintiff, Huneke is familiar with plaintiff and his use of Columbia's mental health services from Huneke's review of inmate patient treatment records and consultations with treating staff as a supervisor. Huneke reviewed and approved seven clinical contact notes that Frisch wrote about plaintiff. A different supervisor (including Dr. Wood) signed off on most of Frisch's other visits with plaintiff, but there is no supervisor signature on Frisch's notes from May 24, June 16 or June 22, 2016 when Frisch was under Huneke's supervision.

Huneke responded to correspondence and psychological service requests from plaintiff on May 19 and 26, 2016, June 13 and 23, 2016, July 7, 14 and 28, 2016 and August 11, 2016. In most cases, Huneke referred plaintiff to Frisch for followup. In any event, each time that plaintiff reached out for services, his needs were promptly evaluated. (Although plaintiff says that he did not get appropriate care from Frisch in response to his requests, he does not say that any of his requests for services went unanswered.)

In Huneke's professional opinion, Frisch performed regular evaluations of plaintiff in which he assessed plaintiff's mental status and provided therapeutic interventions, such as therapy worksheets and clinical interviews. According to Huneke, Frisch and other psychological staff appropriately monitored plaintiff's clinical needs; adjusted plaintiff's diagnosis and performed psychological testing as needed; conducted thorough safety assessments; and provided and offered plaintiff tools to help him with his coping skills. It is Huneke's opinion that plaintiff's mental health code was lowered appropriately to MH-1 to fit his new diagnosis of malingering psychotic symptoms. On the basis of his review of

plaintiff's records, his training and his expertise as a supervisor of psychological services in the prison setting, it is also Huneke's opinion that Frisch's care of plaintiff was thorough, well-documented and consistent with community standards of care.

Huneke's review of the medical record revealed that plaintiff was regularly monitored by psychiatry and offered medication at Columbia, but he medications at first and only later agreed to brief trials. Specifically, plaintiff was offered Risperidone in 2015, Haloperidol in 2016, Diphenhydramine (Benadryl) in 2016, Mirtazapine in 2016, Doxepin in 2017 and Thiothixene in 2017. However, plaintiff was not on medications regularly and consistently for an extended period of time. (In response, plaintiff says he took medication (presumably the Doxepin and Thiothixene) from June 29, 2016 until his release from prison on May 17, 2017.)

G. Plaintiff's Release and Subsequent Revocation of Extended Supervision

Plaintiff was released to extended supervision on May 16, 2017. After his release, plaintiff sought mental health treatment and saw two different doctors who diagnosed depression and anxiety and treated him with medication.

In a written decision dated April 20, 2018, Administrative Law Judge Cynthia Stoppel reviewed the recommended revocation of plaintiff's extended supervision based on several alleged violations of his rules of community supervision between September and November 2017, including incidents in which he exposed himself to others. (I assume that plaintiff was provided an administrative hearing in accordance with Wis. Admin. Code Ch. HA2.)

Stoppel noted in her decision that plaintiff's correctional conduct reports revealed that he had at least two previous exposure incidents while in prison and that prison records showed that he had significant mental health diagnoses but that "[a]ll his prison records . . . note that there are no current mental health issues." Dkt. #51, exh. #3 at 3. She concluded that plaintiff "is clearly in need of extensive mental health treatment" and that "[t]he institutions during his last stay in prison discounted and failed to address any of his mental health needs, instead subjecting him to repeated stays in solitary confinement." Id.

## OPINION

### A. Legal Standards

Plaintiff contends that defendants were deliberately indifferent to his mental health needs and negligent in responding to them. To prevail on a claim under the Eighth Amendment, a prisoner must show that the defendant was "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening. Id. A medical need may be serious if it "significantly affects an individual's daily activities," Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997), if it causes significant pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).

Defendants do not argue that plaintiff's mental health condition fails to meet this standard, and a reasonable jury could conclude from the record that plaintiff had a serious mental health need.

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the risk by failing to take reasonable measures. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). In applying the deliberate indifference standard, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008)). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id.

To prevail on a claim for negligence in Wisconsin, a plaintiff must prove that the defendants breached their duty of care and plaintiff suffered injury as a result. Paul v. Skemp, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865. See also Gill v. Reed, 381 F.3d 649, 658-59 (7th Cir. 2004). Wisconsin law defines medical negligence as "the failure of a medical professional to 'exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.'" Williams v. Thorpe, 2011 WL 4076085, *7 (E.D. Wis. 2011)

(citing <u>Sawyer v. Midelfort</u>, 227 Wis. 2d 124, 149, 595 N.W.2d 423 (1999)).  To establish a prima facie claim for medical negligence, a plaintiff must show that the provider failed to use the required degree of skill exercised by a reasonable provider, that he was harmed, and that there is a causal connection between the provider's failure and his harm.  <u>Id.</u>  Expert testimony is required to establish the standard of care, unless "the situation is one in which common knowledge affords a basis for finding negligence."  <u>Sheahan v. Suliene</u>, 2014 WL 1233700, at *9 (W.D. Wis. 2014).

## B.  <u>Defendants Frisch and Norge</u>

Plaintiff contends that defendants Frisch and Norge continually questioned the severity of his mental health needs after he arrived at the Columbia Correctional Institution in November 2015, misdiagnosed him with malingering symptoms and failed to offer him any treatment when they met with him.  However, plaintiff presents very little evidence to support these contentions, relying primarily on his own conclusory opinions about what conclusions defendants should have reached and how the medical evidence should be interpreted.  The Court of Appeals for the Seventh Circuit has made it clear that "[c]onclusory allegations that have no factual support are insufficient to create a genuine issue of material fact."  <u>Powers v. Dole</u>, 782 F.2d 689, 695 (7th Cir. 1986).  Plaintiff also cites diagnoses made by other providers at different times, general state statutory definitions of "treatment," the opinion of an administrative law judge with no medical training or experience with plaintiff and documents signed by defendants that relate to plaintiff's

housing or security classification. However, as discussed in more detail below, a reasonable jury could not conclude from any of this evidence that Frisch and Norge acted with deliberate indifference or negligence in diagnosing or treating plaintiff.

1. Incorrect diagnosis

Plaintiff criticizes Frisch for not adopting the diagnosis of antisocial personality disorder that his supervisor, Dr. Wood, arrived at during intake upon plaintiff's arrival at Columbia. However, as defendants point out, the record that plaintiff cites does not show that Dr. Wood actually made any diagnosis. Dkt. #51, exh. #7. Dr. Wood signed a form saying "antisocial personality disorder (by hx)" along with delusional disorder as "current diagnoses." Id. However, "hx" refers to history. It is unclear from the evidence presented by the parties whether any provider had determined that plaintiff had a diagnosis of antisocial personality disorder before he arrived at Columbia or whether this was merely an initial impression psychological staff formed from plaintiff's medical record. In any event, "evidence that some medical professionals would have [made a different diagnosis or] chosen a different course of treatment is insufficient to make out a constitutional claim." Petties v. Carter, 836 F.3d 722, 729 (7th Cir. 2016), as amended (Aug. 25, 2016) (internal citation omitted). Plaintiff has failed to show that Frisch acted with either deliberate indifference or negligence in limiting plaintiff's diagnosis at the time of his intake to delusional disorder—precursory type, continuous. Other than the passing reference to antisocial personality disorder on an intake form and plaintiff's own opinion, plaintiff has not

identified any evidence that Frisch ignored or otherwise shown that Frisch failed to exercise medical judgment in reaching his diagnosis. The undisputed facts show that when plaintiff arrived at Columbia, Frisch reviewed plaintiff's records, met with plaintiff on more than one occasion and discussed his findings with his supervisor, Dr. Wood. Moreover, plaintiff has not shown that a diagnosis of antisocial personality disorder in addition to delusional disorder would have made any difference in the treatment that he received. At that time, Frisch assigned plaintiff a mental health code of MH-2A, meaning that plaintiff was suffering from one or more disorders that rose to the level of serious mental illness.

Similarly, plaintiff accuses Frisch of assessing him as having malingering symptoms and "swaying" his psychiatrist to believe the same. Plaintiff fails to discuss his psychiatric treatment or Frisch's role in it in any detail, but he correctly points out that as soon as plaintiff arrived at Columbia, Frisch questioned whether plaintiff was exaggerating his symptoms. However, the undisputed facts show that Frisch did not arrive at his diagnosis of malingering symptoms until he had had an opportunity to evaluate plaintiff more thoroughly. In December 2015, Frisch changed the diagnosis to "delusional disorder, persecutory, and continuous vs malingering (rule out)," but he did not decrease the severity of plaintiff's mental health code. It was not until July 2016, after he had conducted psychological testing and consulted with his supervisor, that Frisch confirmed a malingering diagnosis and decreased the severity of plaintiff's mental health code to MH-1. However, even after the change in diagnosis and mental health code, Frisch and other psychological staff continued to treat plaintiff by meeting with him regularly, responding to his

psychological service requests, referring him to a psychiatrist and offering him medication.

Plaintiff points out that he was given a diagnosis of delusional disorder before he arrived at Columbia and that in October 2016, a psychiatrist, Dr. Rigueur, diagnosed major depressive disorder with psychotic features and a non-specified personality disorder and noted that plaintiff's reports seemed "reliable." However, plaintiff has shown only a difference of opinion among health care providers at different times. The undisputed facts show that Frisch reasonably questioned plaintiff's previous diagnosis of delusional disorder after plaintiff's inconsistent reports of delusions, several clinical visits with plaintiff and plaintiff's psychological test results, all of which were consistent with the symptoms of malingering. Plaintiff contends that the multiple reports he made about another inmate mistreating him and tampering with his property show that he was delusional, but he did not propose any findings of fact about these reports or discuss them in any detail in his brief. In any event, Frisch did not consider the statements and reports that plaintiff made during their visits to be delusional or persecutory, and there is no evidence showing that Frisch's assessment was incorrect or unreasonable in light of all of the facts before him. Although Dr. Rigueur later seemed to reach a different conclusion from Frisch, it is not clear from the record whether Dr. Rigueur had the opportunity to review Frisch's clinical notes or plaintiff's psychological test results because his notes do not refer to them.

In sum, Frisch was entitled to reach his own professional opinion. As discussed above, an acceptable difference of opinion between providers based on their professional judgment is not evidence sufficient to establish deliberate indifference. Petties v. Carter,

836 F.3d 722, 729 (7th Cir. 2016). Without more than this, nothing in the record would allow a reasonable jury to find that Frisch failed to exercise professional judgment in concluding that plaintiff was malingering and should be coded as MH-1 instead of MH-2A.

Plaintiff's claim against Norge is based on two visits Norge had with plaintiff (on November 13, 2015 and March 31, 2016) during which Norge maintained or noted the diagnosis and mental health code assigned by Frisch. The purpose of the November 13, 2015 visit was to respond to plaintiff's request for services, but plaintiff had seen Frisch the day before and did not need further help. On March 31, 2016, plaintiff told Norge that he wanted his mental health code *decreased,* but Norge assessed plaintiff and concluded that his diagnosis of delusional disorder, persecutory type, continuous vs. malingering (rule out) and mental health code as MH-2A remained appropriate. Plaintiff presents no other evidence from which a reasonable jury could conclude that Norge acted with deliberate indifference or negligence. Accordingly, plaintiff's claim against Norge with respect to his diagnoses fails for the same reasons as his claim against Frisch.

2. Ineffective treatment

Plaintiff generally contends that the treatment he received included only unproductive meetings with Frisch and Norge, who merely questioned whether his reported symptoms were real. He points out that in the clinical notes following each visit with plaintiff, Frisch and Norge noted that they would continue to see plaintiff for "clinical monitoring," which plaintiff says is different from treatment. In support of this contention, plaintiff cites Wis.

Stat. 51.01(17), which defines "treatment" as "those psychological, educational, social, chemical, medical or somatic techniques designed to bring about rehabilitation of a mentally ill, alcoholic, drug dependent or developmentally disabled person." However, the statute provides little explanation about what specifically qualifies as treatment, and plaintiff has presented no evidence showing that defendants failed to use such techniques during their regular appointments with him. In fact, the undisputed facts show that Frisch performed regular evaluations of plaintiff in which he assessed plaintiff's mental status and provided therapeutic interventions, including clinical interviews and referrals to psychiatrists for medication. As psychological associates, both Frisch and Norge were responsible for conducting mental health screenings, developing assessments and providing brief individual counseling, crisis intervention and prevention and individual and group psychotherapy. Plaintiff does not identify what treatment he believes he was entitled to and did not receive, but in defendant Huneke's professional opinion, which plaintiff has not refuted, Frisch and other psychological staff appropriately monitored plaintiff's clinical needs, adjusted plaintiff's diagnosis and performed psychological testing as needed, conducted thorough safety assessments and provided and offered plaintiff tools to help him with his coping skills.

Plaintiff finds it significant that defendants Frisch and Norge wrote "no mental health concerns" in their evaluations of him, even though they knew that he had a serious mental illness and was coded as MH-2A for most of his stay at Columbia. However, the records that plaintiff presents in support of his contention are not psychological evaluations but rather "DOC-30 Review of Offender in Program Segregation" forms that include a small box for

a psychological staff member to identify the inmate's mental health code, request a behavior management plan for restrictive housing and briefly note plaintiff's "adjustment" to a segregated or restrictive housing setting. Dkt. #51, exh. #3. Throughout plaintiff's incarceration at Columbia, psychological staff noted on many forms that there were no mental health issues with respect to plaintiff's adjustment to segregation. On one form dated January 19, 2016, Frisch wrote "recent behavioral issues, continues to refuse to double." Id. at 7. If Frisch and Norge did not write a detailed summary of plaintiff's mental health condition or needs on these forms, it does not mean that defendants overlooked the severity of his condition or failed to provide him effective treatment. At most, the forms show that defendants did not have any recommendations or updates for security staff regarding plaintiff's mental health while he was in restrictive housing. From this evidence, a reasonable jury would conclude only that psychology staff used the form to describe problems that plaintiff may encounter or pose in restrictive housing, not to evaluate plaintiff or diagnose his problems. Rather, the clinical notes that Frisch and Norge made following their appointments with plaintiff provide significant details of plaintiff's condition, needs and prognosis.

Finally, plaintiff cites the April 20, 2018 decision of an administrative law judge who noted the following in upholding the revocation of plaintiff's extended supervision:

> Review of [plaintiff's] correctional conduct reports reveal[] that he had at least two prior exposure incidents in the prison system. All his prison records also note that there are no current mental health issues.

\*       \*       \*

> [Plaintiff] is clearly in need of extensive mental health treatment. The institutions during his last stay in prison discounted and failed to address any of his mental health needs, instead subjecting him to repeated stays in solitary confinement.

Dkt. #51, exh. #3 at 3. It is not clear what records the administrative law judge was referring to, but presumably she meant the Review of Offender in Program Segregation forms that plaintiff submitted in the same exhibit as her decision. However, the forms are not treatment records and do not reflect Frisch's or Norge's complete diagnoses, care or assessment of plaintiff. In any event, the administrative law judge's opinion on plaintiff's mental health treatment is not relevant or helpful because she does not explain the bases of her conclusions and she is not a psychological expert qualified to reach an opinion about the appropriateness of plaintiff's mental health treatment for purposes of this case.

In sum, there are no material facts in dispute and no reasonable jury could conclude from the undisputed facts that defendants Frisch and Norge acted with deliberate indifference or negligence in diagnosing or treating plaintiff's mental health condition. Accordingly, Frisch and Norge are entitled to summary judgment with respect to plaintiff's Eighth Amendment and state law negligence claims against them.

## C. Defendant Huneke

Plaintiff contends that defendant Huneke "supported" the actions of defendants Frisch and Norge as their supervisor and the head of the psychological services unit, ignored plaintiff's repeated complaints that he was not being provided mental health treatment and did not review or approve Frisch's clinical contact notes from his May 24, June 16 or June

22, 2016 visits with plaintiff. However, § 1983 "does not establish a system of vicarious liability; a public employee's liability is premised on [his] own knowledge and actions, and therefore requires evidence that each defendant, through her own actions, violated the Constitution." Aguilar v. Gaston-Camara, 861 F.3d 626, 630 (7th Cir. 2017). It is undisputed that Huneke did not provide any direct care to plaintiff. To the extent that plaintiff is arguing that Huneke personally reviewed and approved an inadequate course of treatment for plaintiff, that argument fails because I already have found that plaintiff has failed to present any evidence from which a reasonable jury could conclude that the mental health treatment he received fell below an acceptable standard of care.

Although plaintiff alleges that Huneke ignored complaints that plaintiff made about his treatment, plaintiff has not proposed any findings of fact or otherwise described what complaints he made, when he made them or what Huneke said in response. It is undisputed that Huneke responded to correspondence and psychological service requests from plaintiff on May 19 and 26, 2016, June 13 and 23, 2016, July 7, 14 and 28, 2016 and August 11, 2016. In most cases, Huneke referred plaintiff to Frisch, who promptly evaluated plaintiff's needs. Although plaintiff may not have liked the followup that Frisch provided, he has failed to present any evidence showing that either Huneke or Frisch acted with deliberate indifference or negligence in responding to his requests.

Plaintiff is correct that Huneke did not sign three of Frisch's clinical notes, but it is undisputed that Huneke or another supervisor regularly reviewed and signed the remainder of Frisch's clinical notes regarding plaintiff's care and that Huneke met with Frisch weekly

to review the care and progress of plaintiff and the other patients assigned to Frisch. Plaintiff does not contend that Huneke's failure to review these particular records caused him any injury. Although Frisch decided to administer plaintiff psychological testing around this period of time, it is undisputed that he discussed that decision with Huneke and received his approval to do so. Further, Huneke agreed that Frisch's resulting diagnosis was appropriate in light of the test results.

Accordingly, because no reasonable jury could find that defendant Huneke acted with deliberate indifference or failed to use the required degree of skill exercised by a reasonable provider, he is entitled to summary judgment with respect to plaintiff's Eighth Amendment and state negligence law claims against him.


ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Daniel Frisch, Daniel Huneke and Daniel Norge, dkt. #36, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 13th day of September, 2018.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge